# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

RALPH WILLIAM LEE, # 368598      *

v.      *      Civil Action No. CCB-12-1886

S. GERGIUS, CO II      *
W. BOWERS, CO II
SGT. CARRINGTON      *
SGT. LUSHBAUGH
WINDY WATTS, RN      *
WETZEL, CO II

     *

## MEMORANDUM

Before the court is self-represented plaintiff Ralph William Lee's ("Lee") complaint under 42 U.S.C. § 1983. Defendants J. Michael Stouffer, Phillip Morgan, Bradley Wetzel, Kellar Covington and Ray Lushbaugh,[1] through their counsel, have filed a Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment. (ECF No. 22). Lee has filed a pleading in opposition. (ECF No. 24).[2] After review of the record, the court finds a hearing is not necessary. *See* Local Rule 105.6 (D. Md. 2011). For reasons to follow, defendants' motion, treated as a motion for summary judgment, will be granted in part and denied in part. Summary judgment will be granted as to J. Michael Stouffer, Phillip Morgan, Bradley Wetzel, and Kellar Covington. Summary judgment will be denied as to Ray Lushbaugh with leave to refile dispositive pleadings within sixty days.[3]

---

[1] Service was not obtained on S. Gergius, Windy Watts, R.N. or W. Bowers. *See infra* p. 3 and notes 4 and 6.

[2] Lee does not provide any declarations in support of his complaint or with his opposition pleading.

[3] If dispositive pleadings are not filed within this period, a scheduling order shall issue.

## BACKGROUND

### A. PLAINTIFF'S CLAIMS

In this complaint, Lee, currently an inmate at Jessup Correctional Institution ("JCI"), presents claims arising from events which occurred at the time he was housed at the Maryland Correctional Training Center ("MCTC"). He claims that 1) defendants acted with deliberate indifference to his medical needs in regard to injuries he sustained on July 5, 2011, when the prison van he was riding in was involved in a vehicular accident; 2) defendants used excessive force against him on October 8, 2011, December 22, 2011, and January 13, 2012; and 3) on November 17, 2011, he was placed in a strip cell for 40 days. (ECF Nos. 1 and 4).

Lee, who is suing defendants in their official and individual capacities (ECF No. 4 at 2, ¶ 7), requests unspecified compensatory and punitive damages and injunctive relief, directing defendants to provide him with a cane, surgery, assignment to an institution outside the Hagerstown-Cumberland area,[4] replacement of his walker, physical therapy, and compliance with the medical instructions he was given at Johns Hopkins Hospital at Bayview. (ECF No. 1 at 5). Lee's allegations follow.

### 1. VAN ACCIDENT

On July 5, 2011, Lee was a passenger in a transport van allegedly driven by Officer Gergius [5] and traveling from the Baltimore City Correctional Center to MCTC. Lee claims his

---

[4] Lee is currently housed at JCI and no longer housed in the Hagerstown-Cumberland area, thereby rendering this request for relief moot. In September of 2012, Lee began a hunger strike to prompt his eventual transfer from MCTC (ECF No. 22, Exhibit 2 at 226, 238-49). On September 17, 2012, he was transferred to JCI. (ECF No. 24, Plaintiff's Attachments at 4).

[5] As noted, service has not been obtained on S. Gergius, Windy Watts, R.N. or W. Bowers. (ECF Nos. 9 and 14). Lee claims "brutality" by S. Gergius and Windy Watts on October 8, 2011. (ECF No. 1 at 8). Lee seems to have named Gergius as a defendant in error; Gergius was not the driver of the van in the accident as claimed, but the

ankles, hands, and waist were restrained and he was not placed in a seat belt. Further, he claims the van was speeding when it crashed into another car.

Lee claims he "black[ed] out and woke up on the floor of the vehicle."  (ECF No. 4 at 3.) He claims he was "injured badly, my back in severe pain also my neck, legs and feet." *Id*.  Lee alleges he was not permitted to get treatment for his injuries until September 5, 2011, despite informing the officers of his injuries at time of the accident.

Lee alleges the injuries he sustained during the accident were allowed to worsen before an MRI [6] was performed on his back on September 5, 2011.  The MRI showed a herniated disc. Lee states he was seen at Johns Hopkins Bayview Medical Center where he was prescribed pain medication and provided a walker. He faults prison medical staff for failing to follow Johns Hopkins Bayview instructions or provide prescribed medications to him.  *See id*. at 4.  He states the walker was mailed to his home. *See id*.

## B.  Excessive Force

Lee states his back "gave out" on October 3, 2011.  He was sent to the infirmary on October 8, 2011.  At the infirmary on October 8, 2011, he was allegedly beaten by Sgt. Lushbaugh ("Lushbaugh"), Officer Bowers ("Bowers"), and other unnamed officers in the infirmary and then beaten again afterwards in a "strip cell."  *See id*. at 4-5. Lee states he was pushed out of his wheelchair to the floor, placed in handcuffs from behind, and injected with "an

---

driver who transported him from the scene of the accident for medical evaluation. (ECF No. 22, Exhibit 1 at 6).  Lee makes no allegations of improper conduct against the driver who took him for medical evaluation.

[6] Magnetic resonance imaging (MRI) is a test that uses a magnetic field and pulses of radio wave energy to make pictures of organs and structures inside the body. *See* http://www.webmd.com/a-to-z-guides/magnetic-resonance-imaging-mri.

unknown substance"[7] that caused him to sleep after Lushbaugh, Bowers, and other unidentified officers beat him in the cell. He states he urinated and defecated on himself for six months. According to Lee, he was about to have surgery until correctional officers "stop[ped] it from happen[ing], then sent me back to the prison to the strip cell." *Id.* Lee states he remained in the strip cell for about forty days. He claims that on December 22, 2011, he was again placed in a strip cell. There he was again beaten by Sgt. Covington ("Covington") and Officer Wetzel ("Wetzel") for two days. Lee also alleges that was beaten by Wetzel on January 13, 2012, and placed in a strip cell.

## C. DEFENDANTS' RESPONSE

### 1. MEDICAL CARE

Defendants verified exhibits demonstrate that on July 5, 2011, Lee and three other inmates[8] were traveling in a Maryland Department of Corrections ("DOC") vehicle westbound on Maryland Interstate 70, driven by Corporal Frank Smith, when it was involved in an accident. (ECF No. 22, Exhibit 1 at 2-6).[9] After Lee complained that his head and back were injured in the accident, he was immediately transported by Officers Sherif Gergius and Rodney Rogers to the Metropolitan Transition Center ("MTC") Dispensary for evaluation and treatment. *See id.*

Upon arrival at MTC, Lee complained that he had been struck by a box during the accident, had lost consciousness for about ten seconds, and felt "woozy and nauseated." (Exhibit

---

[7] Lee alleges Windy Watts, R.N., injected him with medication to make him sleep after officers beat him in a cell on October 8, 2011. (ECF No. 4 at 4.) Lee does not raise a claim of involuntary medication, nor do defendants address whether an injection was given. Curiously, although the injection is noted in the hearing examiner's decision regarding Lee's notice of infraction from the October 8, 2011, incident, defendants' submissions do not contain medical records indicating an injection was given to Lee on that date. (ECF No. 22, Exhibit 1 at 8.)

[8] The other inmates traveling in the vehicle did not complain of injury and signed medical waivers refusing treatment. (ECF No. 22, Exhibit 1 at 2-4.)

[9] All exhibits referenced are at ECF No. 22, unless otherwise indicated.

2, Plaintiff's Medical Records at 1-2). Dr. Sunday Nwosa examined Lee and ordered x-rays. The results were negative for acute injury. *See id*. Dr. Nwosa prescribed Motrin for Lee's pain, advised him to apply an ice pack to his knee, and cleared him for transport to MCTC.

On July 22, 2011, Dr. Contah Nimely saw Lee for follow-up care at MCTC. *See id*. at 6. Lee complained of continuing back pain, but reported that his neck pain had resolved. *See id*. Dr. Nimely prescribed pain medication (baclofen and naproxen) and informed Lee that he could go to the recreation yard and back to work. *See id*.

On August 2, 2011, Lee was seen by Wanda Diaz, R.N., for complaints of "chronic pain," and "pain in [his] lower back and buttocks [with] tingling and numbness" which Lee attributed as results of the accident. *Id*. at 7-8. He reported his prescribed pain medication "doesn't work." *Id*. at 7. Nurse Diaz advised Lee to continue his medications as ordered for one to two weeks and to make a follow-up appointment if he did not improve. *See id*.

On August 4, 2011, Dr. Colin Ottey examined Lee for complaints of lower back pain, light headedness, headache, nausea, vomiting and lack of appetite. *See id*. at 9. Examination revealed his vital signs were within normal limits with no signs of active nausea or vomiting. *See id*. Lee was told to continue his current treatment plan and submit a sick call request if his symptoms did not improve. *See id*.

On August 16, 2011, Janine Griffith, P.A, ("Griffith") saw Lee for complaints of "unrelenting back pain" from the accident. *Id*. at 10-11. Lee was placed on a course of prednisone and x-rays of his back and spine were performed. *See id*. at 10-12. The results of these x-rays were negative. *See id*. at 12.

On August 30, 2011, Lee was observed by pharmacy staff taking baclofen from the medication line and placing it in his pocket instead of ingesting it. *See id*. at 14. Accordingly, Griffith ordered crushing Lee's baclofen and naproxen pills before providing them to him. *See id*.

On September 1, 2011, Dr. Nimely examined Lee, who presented complaints of severe upper and lower back pain. *Id*. at 15-16. Lee reported he had been unable to walk to the dining hall for two days. *See id*. Dr. Nimely continued Lee on his treatment plan and told him to follow up the next day with a physician's assistant. *See id*.

On September 2, 2011, Lee continued to complain of neck and back pain. *See id*. at 17-20. He indicated he was unable walk to the dining hall and was admitted to the infirmary at the Maryland Correctional Institution-Hagerstown ("MCI-H").[10] *See id*. Lee told Kathleen McCauley, R.N., ("McCauley") the Tylenol tablets he was given were effective in managing his pain. *See id.* at 19. She wrote in his medical chart that Lee "was independent for bed mobility, with no evidence of pain. Turns from side to side. Sits upright without assistance. Ate 100% of breakfast in bed." *Id*.

Some four hours later, Dr. Sadik Ali examined Lee. *See id* at 17-18. During this visit, Lee refused to ambulate and requested a cane. *See id*. Dr. Ali observed Lee's pain was stable, ordered a walker and physical therapy for him, and encouraged him to move as much as possible. *See id*.

On September 4, 2011, Lee reported back pain and stiffness but no bladder or bowel incontinence. *See id*. at 23. The following day, Lee stated that he had urinated on himself in bed.

---

[10] MCTC does not have an infirmary (hospital). Inmates at MCTC who need hospitalization are admitted to the infirmary at MCI-H. (ECF No 22, Memorandum, note 3).

*See id*. at 25.  Lee was then assisted to the shower.  *See id*. It was noted that when Lee returned from the shower, he appeared in "no acute distress," and was "able to move in bed without difficulty." *Id*. at 25-26.

Lee continued presenting complaints of severe lower back pain. On September 6, 2011, he was sent to Bon Secours Hospital for "acute lumbago/disk prolapse" and "spastic paraplegia." *See id*. at 29-30.  An MRI revealed a lumbar spine disc prolapse at L5-SI. *See id*. at 31, 131. Lee was subsequently transferred to Johns Hopkins Hospital where he was admitted and surgical intervention was offered.  *See id*. at 131.  Lee would not sign the consent form and was treated with intravenous pain medication which improved his condition.[11] *See id*.  He was discharged the next day.  *See id*.

On September, 8, 2011, Lee was admitted for an overnight stay at the infirmary at MCI-H for observation following his discharge from Johns Hopkins Hospital.  *See id*. at 30-31. Lee was uncooperative.  He refused a physical examination and his medications and refused to provide his medical history, answer questions about his medical condition, and answer questions about his visit to Johns Hopkins Hospital.  *See id*.  His medical notes from that date indicate he did not appear to be in acute distress. *See id*. at 30.

On September 9, 2011, Sadik Ali, M.D., ("Ali") saw Lee in the MCI-H infirmary. *See id*. at 37-38. Ali observed Lee was "uncooperative, argumentative, and arrogant," and wanted to be discharged. *Id.* Ali explained to Lee that he could not be discharged until he was able to walk without a walker. *See id*. Later that evening, Doni Obitts, L.P.N. ("Obitts") saw Lee. *See id*. at 33. Obitts's notes indicate Lee was "upright and ambulating without rigidity or distress." *Id*.

---

[11]    Lee acknowledges that he refused surgical intervention.  He states he decided to "wait for surgery unto [sic] I get home." (ECF No. 4 at 3.)

Obitts also observed that Lee "[w]alked to and from the bathroom, picked trash up from the floor, folded up [his] walker [and] bent over and slid it under the bed [with] no complaints." *Id*. On September 9, 2011, Lee was recommended for physical therapy. *See id*. at 35. The next day, Lee reported that his pain had improved. *See id*. at 40. He walked without a cane or walker and was therefore discharged from the infirmary and sent back to MCTC on September 11th. *See id*. at 41.

On September 17, 2011, Dr. Alan Rohrer ("Rohrer") saw Lee for a psychiatric evaluation. *See id*. at 44-45. Lee complained of a "depressed mood" since the accident on July 5, 2011, but told Rohrer he did not want any treatment for his mood and was not interested in mental health services. *See id*. Lee stated that he wanted treatment only for his pain and "pain management." *Id*. Rohrer deferred diagnosis based on Lee's reluctance to cooperate during the examination. *See id*. at 45.

On September 23, 2011, Wendy Koontz, R.N. saw Lee regarding his concerns of chronic back pain. *See id*. at 49-50. Lee asked to be provided "the proper care that was ordered for [him] at Johns Hopkins," as well as a walker and proper pain management. *Id*. Lee was instructed to continue physical therapy and his current medications. *See id*. He was also encouraged to walk as much as possible to strengthen his legs and back. *See id*.

On September 30, 2011, Griffith saw Lee for complaints of back pain. *See id*. at 52-53. Griffith attempted to discuss the treatment plan, but Lee reportedly refused to cooperate. *See id*. at 53. Lee told her "I know my eighth amendment rights and I need a walker or a cane and a back brace." *Id*. at 52. Griffith informed Lee that she had observed him walking from his cell to the dispensary that day and that a cane and/or walker were unnecessary. *See id*. at 53. Lee

responded by saying "well this is cruel and unusual punishment. I have shooting pains and you are refusing me care and I will get what I want no matter how many sick calls it takes." *Id*.

On October 3, 2011, Lee was brought on a stretcher to the dispensary at MCTC after he reportedly fell on the way to the dining hall. *See id*. at 54-57. Nurse Mary Ellen Bryan evaluated Lee, assisted him from the stretcher to a mat on the floor, and gave him Tylenol for pain. *See id*. at 56-57. Approximately two hours later, Dr. Nimely examined Lee and admitted him to the infirmary at MCI-H with a diagnosis of "ambulatory dysfunction." *Id*. at 54-55. At the infirmary, Lee refused to sign the consent forms and therefore could not be assessed. *See id*. at 59.

Lee continued to refuse to consent to evaluation, stating "I only sign what my lawyer tells me to sign." *Id*. at 60. During rounds, Dr. Ali noted that Lee was "able to stand and walk, if he wants too [sic]" *Id*. at 62. Ali also indicated Lee's "neuro-status does not reveal immobility" and referred him for another psychiatric consultation. *See id*. at 62, 65.

During infirmary rounds on October 6, 2011, Lee asked for a urinal. *See id*. at 68. Medical staff denied Lee's request because he had been observed on several occasion out of his wheelchair and walking around the ward. *See id*.[12] He was instructed to get up and use the bathroom on his own and, generally, to do as much for himself as possible. *See id*.

During afternoon rounds on October 7, 2011, Lee complained of incontinence although his clothes and bed linens were clean and dry. *See id*. at 73. Lee was observed standing and reaching to change the channel on the television that hung approximately eight feet off the floor

---

[12]   On October 4, 2011, Lee ambulated by himself to use the telephone. (Exhibit 2 at 67.) Lee then returned to the medical ward where he was observed "doing wheelies" by medical personal. *See id.* Afterward, he got back into bed by himself. *See id*.

of his cell. *See id*. He refused to sign a release to enable prison officials to request his medical records from Johns Hopkins Hospital. *See id.*

On October 8, 2011, Lee became disruptive and arrangements were made to transfer him to an isolation cell. (Exhibit 3, Lushbaugh Declaration, ¶ 3; *see also* Exhibit 1 at 8.) Lee claimed he was unable to move by himself and refused to move to the isolation cell. Correctional officers then attempted to place him in a wheelchair for transport. *See* Exhibit 3, ¶ 3. Defendants' records indicate that as the officers seated Lee in the wheelchair, Lee stiffened his entire body and slid to the floor in an attempt to resist their assistance. *See id*. The officers cautioned Lee that he could injure himself if he continued to resist. *See id*. Lee became combative and started swinging his arms and legs in an aggressive manner. *See id*. In response to this behavior, the officers attempted to put Lee in handcuffs. *See id*. Lee pulled his arm away and threw a punch in the direction of one of the officers. *See id*. At this point, Lee was handcuffed without further incident and taken to the isolation cell. *See id*.[13] Hospital staff gave Lee an injection to calm him. (Exhibit 1 at 8).[14]

Lee was visited the next morning at 4:49 am by McCauley, who reported that Lee refused assessment, refused to move off his mattress, laid on his bed, and was able to pick up his head and arch his back upward. (Exhibit 2 at 78.) Lee reportedly rose from the bed on his knees and removed the toilet paper he had packed in the observation window of the cell. *See id*. He was reported to be able to move his upper extremities without difficulty. *See id.*

---

[13] Defendants do not address Lee's claim he was placed in a "strip cell" for forty days on November 11, 2011. Lee has not alleged any injury as a result of his alleged placement in a "strip cell" during this time.

[14] *See Supra* note 7.

On October 9, 2011, Lee reported suffering a head injury the previous night and complained of dizziness. *See id.* at 79. Tamara Medina, R.N., reported Lee was alert and responsive with appropriate speech. She observed no swelling or abrasions to the head. Lee stated he was unable to feel or move his legs. *See id.* Lee moved his upper extremities without difficulty and required assistance to get up from the fetal position for the examination. He refused to take deep breaths as part of the examination. Lee indicated that he did not know how toilet tissue placed in the cell ceiling vent had been placed there. *See id.*

Lee was later issued a Notice of Violation by Officer Bowers and found guilty of attempted assault on a correctional officer based on the October 8th incident. Lee was given 180 days of disciplinary segregation. (Exhibit 1 at 7-15). The report of the disciplinary hearing reads in part:

> Inmate states I don't know what happened. I don't know why officer had to put me in the wheel chair when medical staff are present. Medical should put me in wheel chair. No officers should put there [sic] hands on me. It's crazy he's tellin on himself. I am telling you this based on the facts in the report . . . . I would like this to go away.

*Id.* at 10. The hearing examiner determined the report of the incident "credible and reliable." *Id.* at 11. The hearing examiner found:

> [Inmate] stated his defense was backed by the facts in the violation. Inmate stated no officer has a right to "put hands" on you . . . he was in the medical department. Inmate demeanor was also considered in this decision. He repeatedly stated staff should not put their hands on him. He fould [sic] this objectionable. His actions and testimony confirm the violation. HO [hearing officer] finds inmate guilty of rule 101 as defined by COMAR . . . . The offer or attempt to do harm as well as the ability to carry it out.

*Id.* at 11.

Defendants indicate Lee returned to the infirmary the following day where he remained until October 31, 2011. (ECF No. 22, Defendants' Memorandum at 8, Exhibit 2 at 74-134). On October 11, 2011, Dr. Ali determined Lee's physical examination unremarkable except for lower back stiffness. *See* Exhibit 2 at 87. On October 12, 2011, Lee refused to be examined by Robert VandenBosche, M.D. *See id.* at 91. Lee was repeatedly observed walking on his own despite his claims that he was unable to walk and that his pain level was 10 out of 10, with 10 the highest pain level possible. *See id.* at 78, 79, 85, 94, 113, 122, & 129. Lee was observed to be "angry," "argumentative" and generally uncooperative with the medical staff. *See id.* at 79, 89, 91, & 92.

On October 31, 2011, Lee started to show signs of progressive weakness in his lower extremities. *See id.* at 131. Dr. Ali wrote on Lee's medical chart that Lee had developed signs of *cauda equine* syndrome,[15] was agreeable to surgical intervention, had been approved for the procedure, and needed urgent intervention. *See id.* at 132. Due to the progression of weakness, Lee was sent to the University of Maryland Medical Center Emergency Room/Neurosurgery by state van in a wheelchair. *See id.* It is unclear whether Lee was in fact transported to the University of Maryland Medical Center or Johns Hopkins Hospital.[16] Lee's medical records show he was diagnosed with bilateral lower extremity numbness and weakness and discharged with Tylenol from Johns Hopkins Hospital. On November 1, 2011, he was readmitted to the MCI-H infirmary. *See id.* at 135, 138-139. Lee was hospitalized at the MCI-H for fourteen days.

---

[15] Cauda equine syndrome is a disorder that usually requires emergency surgical intervention. In patients with cauda equina syndrome, something compresses on the spinal nerve roots. Fast treatment may be needed to prevent lasting damage leading to incontinence and possibly permanent paralysis of the legs. *See* http://www.webmd.com/back-pain/guide/cauda-equina-syndrome-overview.

[16] It is unclear whether Lee was seen at the University of Maryland Medical Center. (ECF No. 2 at 174). No reports from either Johns Hopkins Hospital or the University of Maryland Medical Center are in the record before this court. It is to be noted that Lee refused to sign release forms to allow prison medical providers access to his Johns Hopkins Hospital or Johns Hopkins Hospital at Bayview medical records. (Exhibit 2 at 73, 138, 143.)

*See id.* at 135-165.   Lee continued to state that he was unable to walk.  *See id.* at 38, 150, 154. Lee was observed by medical staff walking around without the assistance of a cane or walker. *See id.* at 138-139.

On November 8, 2011, Dr. Ali noted that the neurologist at Johns Hopkins hospital "could not establish any organic pathology" that could explain Lee's claimed inability to walk and that he should therefore remain on a conservative course of treatment.  *See id.* at 150. For the next week Lee continued to voice concerns that he could not feel his legs or walk. *Id.* at 154-61. Dr. Ali noted Lee had a "small disc bulge at L5-S1 which does not compress any significant nerve root."  *Id.* at 150.

On November 14, 2011, Dr. Ali recorded that Lee was "not concerned for his health, rather his attorney's advice, to prepare himself for anticipated compensation." *Id.* at 162. He also noted Lee was unwilling to be examined or be evaluated by psychiatry staff. *See id.* Dr. Ali discontinued Lee's medications for his neck and his back because "he had no significant organic pathology" in those areas, and discharged him back to MCTC. *See id.* at 164.

On November 16, 2011, Dr. Rohrer met with Lee. Lee reported he was unable to walk due to his back and leg pain.  Lee stated he was depressed due to his pain.  *See id.* at 166.  Rohrer recommended additional psychological assessment for Lee. *See id.* at 168.

On November 17, 2011, Dr. Ali wrote that Lee had "no apparent medical reason for a wheelchair" but allowed him to have one to make Lee's transport easier for the correctional staff. *See id.* at 170.   Dr. Ali also recommended Lee for cognitive behavioral therapy and encouraged him to walk. *See id.* On December 21, 2011, Dr. Ali discontinued Lee's use of the wheelchair

after reviewing a video in which Lee was walking, ascending and descending stairs, and bending down to tie his shoelaces. *See id.* at 181.

After repeatedly observing Lee was able to walk, prison officials ordered his transfer from Housing Unit #8, a wheelchair accessible unit to Housing Unit #5. (Exhibit 4: Covington Declaration at ¶ 4.)  On December 22, 2011, Kellar Covington ("Covington"), the officer in charge of Housing Unit #8, ordered Lee to pack his belongings and walk to Housing Unit #5. *See id*; *see also* Exhibit 1 at 18. Plaintiff refused, stating, "I ain't moving, I can't walk." Exhibit 4, at ¶ 4. Covington then gave Lee a direct order to get out of his wheelchair and walk to Housing Unit #5.  *See* Exhibit 1 at 18. Lee refused again.  Covington and Officer Staley then lifted Lee from his wheelchair onto a stretcher. *See id.* Lee did not resist their efforts. *See id.* The officers carried Lee out of Housing Unit #8. *See id.* When they arrived at the front door of Housing Unit #5, Covington ordered Lee to walk into the unit.  Lee again refused to move.  *See id.* Covington and Officer Staley then assisted Lee into his cell. *See id.*  Lee did not resist. *See id.*  As a result of this incident, Lee was charged with, and found guilty of, refusing a housing assignment and demonstrating disrespect towards a correctional officer. (Exhibit 1 at 6-23).

Lee subsequently submitted sick call requests for pain medication, a back brace, a cane or walker, and adult briefs. (Exhibit 2 at 182). On January 13, 2012, Lee was seen by Daniel Baumgardner, R.N. ("Baumgardner") regarding these requests. *See id.* Lee refused to walk from the waiting room to the examination room, stating that he was unable to walk. *See id.* When Baumgardner informed Lee that he had been observed and recorded by prison staff walking around his cell and in the prison on several occasions, Lee responded, "[y]ou can tell all that to the fuckin' judge. I ain't walkin' over there. I don't need to see you." *Id.*

14

On January 18, 2012, Lee was again referred for physical therapy. *See id.* at 186. On April 19, 2012, Lee was examined by Dr. Nimely who found Lee's ambulatory difficulties "inconsistent with [his] motor exam" and observed that Lee continued to be non-compliant with his physical therapy regimen. *Id.* at 197.

### 2. EXCESSIVE FORCE

In support of their dispositive pleading, defendants Lushbaugh, Covington, and Wetzel have submitted declarations refuting Lee's claims of excessive force. (Exhibits 3, 4, 5). In his declaration, Lushbaugh attests that during the incident on October 8, 2011:

> I did not physically touch the Plaintiff. My role was simply to instruct the responding officers on what to do, and to be there in the event they needed back-up. I did not beat the Plaintiff or otherwise touch him in an improper manner.

(Exhibit 3, ¶ 5).

In regard to the incident on December 22, 2011, when Lee was transferred from the wheelchair accessible unit, Covington states:

> At no point in time during this incident did I use force against the Plaintiff, nor did he struggle or otherwise try to resist my efforts to move him. During this incident, the only correctional officer assisting me was Officer J. Staley. Officer Bradley Wetzel was not present during this time.

(Exhibit 4, ¶¶ 5-6).

Officer Bradley Wetzel attests in his declaration:

> On January 22, 2011, I was working as a correctional officer in Housing Unit # 5 at MCTC. I was not involved in the transport of Plaintiff from Housing Unit # 8 to Housing Unit # 5 that day. Further, I was not involved in any use of force against Plaintiff, nor did I otherwise have any physical contact with him on that day.

(Exhibit 5, ¶ 4).

15

Additionally, Wetzel denies involvement in the alleged use of force against Lee on

January 13, 2012, attesting:

> I was not involved in a use of force against Plaintiff on January 13,
> 2012, nor did I otherwise have any physical contact with him on that
> day. I have never been involved in a use of force against Plaintiff.

(Exhibit 5, ¶ 5). In light of the above, defendants argue they are entitle to summary judgment in

their favor.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified

that this does not mean that any factual dispute will defeat the motion. "By its very terms, this

standard provides that the mere existence of some alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986). Whether a fact is material depends upon the substantive law. *See id*.

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the facts and draw reasonable inferences 'in the light most favorable to the

party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)

(alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the

court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted). Lastly, the court is mindful that Lee is a self-represented litigant and therefore has construed his pleadings liberally. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## DISCUSSION

### A. ELEVENTH AMENDMENT

Insofar as Lee is suing the defendants in their official capacities for monetary damages (ECF No. 4 at 2), the claims against them are barred under the Eleventh Amendment. The Eleventh Amendment to the United States Constitution, which preserves the sovereign immunity of the states, precludes a private individual from suing an unconsenting state or its agencies for monetary damages in federal court, absent waiver or a valid Congressional abrogation of sovereign immunity. *See Seminole Tribe v. Florida*, 517 U.S. 44, 56-58 (1996); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101-02 (1984). In this case, defendants are employees of agencies of the State of Maryland that are entitled to sovereign immunity from suit under the Eleventh Amendment. "While the State of Maryland has waived its sovereign immunity for certain types of cases brought in State courts, *see* Md. Code Ann., State Gov't, § 12-101, *et seq.*, it has not waived its immunity under the Eleventh Amendment to suit in federal court." *Dixon v. Baltimore City Police Department*, 345 F. Supp. 2d 512, 513 (D. Md. 2003). Thus, the claims for monetary damages brought against them in their official capacities will be dismissed.

### B. CLAIMS AGAINST DEFENDANTS STOUFFER AND MORGAN

Defendants argue that the claims against J. Michael Stouffer ("Stouffer") and Phillip Morgan ("Morgan") in their individual capacities should be dismissed because Lee has failed to allege facts sufficient to state a claim against them. A defendant must have been personally involved in the allegedly unconstitutional action or omission to act to be liable in a § 1983 action. *See Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985). Lee's sole mention of Stouffer is that he "is legally responsible for the overall operation of the department and each institution under its jurisdiction," including MCTC. (ECF No. 4 at 2). In a similar vein, Lee attributes liability to Morgan solely because he is "legally responsible for the operation" of MCTC and the "welfare of all inmates of that prison." *Id.* Lee presents no specific allegations of fact against either Stouffer or Morgan.

A defendant in a § 1983 action may not be held liable based upon the theory of *respondeat superior*.[17] *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Instead, supervisory liability is "determined 'by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: 1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; 2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and 3)

---

[17] Respondeat superior is a legal doctrine whereby an employer may be held responsible for its employees.

there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw*, 13 F.3d at 799. Lee has failed to allege that either Stouffer or Morgan was personally involved in the incidents at issue or that any of their supervisory actions caused his purported injuries.

### C. EIGHTH AMENDMENT CLAIMS

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *See Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Graham v. Connor*, 490 U.S. 386, 392 (1989); *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). To determine whether a prison official has violated the Eighth Amendment, courts must analyze both subjective and objective components. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Eighth Amendment analysis requires "inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "What is necessary to establish an unnecessary and wanton infliction of pain" with regard to each component "varies according to the nature of the alleged constitutional violation." *Hudson*, 503 U.S. at 5.

### 1. MEDICAL TREATMENT

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the inmate was suffering from a serious medical need and that, subjectively, the prison staff were aware of the

need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk a defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2001).

As non-medical supervisory prison officials, defendants are entitled to rely on the medical judgment and expertise of prison physicians and medical staff concerning the course of treatment necessary for inmates. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990) (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with an inmate's medical treatment ordered by such personnel). The record shows Lee was provided medical attention immediately after the van

accident and continuously thereafter for his complaints of resulting injury. Notably, he provides no support for his allegation that defendants prevented his surgery. Indeed, he does not dispute defendants' well-supported assertions that he refused to consent to a surgical procedure and often failed to cooperate and resisted efforts by numerous medical practitioners to provide him with care and treatment. Viewing the facts in the light most favorable to Lee, there is no genuine issue of material fact in dispute as to whether defendants' actions showed requisite deliberate indifference to his serious medical needs. Consequently, defendants are entitled to judgment in their favor as a matter of law.

## 2. EXCESSIVE FORCE

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (citation omitted). A court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *See Whitley v. Albers*, 475 U.S. 312, 321 (1986). Absence of significant injury alone is not dispositive of a claim of excessive force. *See Wilkens v. Gaddy*, 559 U.S. 34, 36-37 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *See Wilkens*, 559 U.S. at 38. "When evaluating evidence to determine whether it is legally sufficient to satisfy the subjective [standard], a court may allow an inmate's claim to go to the

jury only if it concludes that the evidence viewed in the light most favorable to the claimant, 'will support a reliable inference of wantonness in the infliction of pain.'" *Stanley v. Hejirika*, 134 F.3d 629, 634 (4th Cir. 1998) (quoting *Whitley*, 475 U.S. at 322).

In regard to the October 8, 2011, incident, Lee claims he was beaten by Lushbaugh "inside the infirmary" after he was pushed from his wheelchair to the floor and placed in handcuffs. ECF No. 4 at 3-4. The record shows Lee would not transfer to a wheelchair on his own accord to be taken to an isolation cell, and therefore he was seated in the wheelchair by corrections officers. When Lee resisted, he was placed in handcuffs. As a result of this incident, Lee was found guilty of attempting to assault Officer Bowers and given 180 days of disciplinary segregation. *See supra* pp. 8-9. Lushbaugh attests he did not touch Lee but supervised his transfer. *See supra* p. 13. Lee does not provide any evidence to dispute the verified exhibits provided by defendants.

Similarly, in their declarations, Covington and Wetzel deny using excessive force against Lee on December 22, 2011. Covington attests that he and Officer Staley assisted Lee onto a stretcher to move him into a new cell after Lee refused to ambulate on his own. Wetzel, contrary to Lee's assertions, was not present. *See supra* p. 14. Further, Wetzel denies having any physical contact with Lee on January 13, 2012. *See supra* p. 14. Lee provides no evidence to dispute these declarations.[18]

It is of concern that defendants do not directly address or refute Lee's claim that on October 8, 2011, after he was placed in handcuffs in the infirmary, he was taken to a cell and beaten by corrections officers, and then injected with a sleeping medication. As noted, the injection was part of the record during the Notice of Infraction hearing. *See supra* p. 3 and note

---

[18] As earlier noted, Lee provides no affidavits in support of his claims.

7.   The medical records provided by defendants, however, do not show administration of an injection to Lee on October 8, 2011.   Additionally, Lushbaugh's declaration addresses events that occurred only in the infirmary, not afterwards in the isolation cell. Although there appears to have been an internal investigation of Lee's use of force claims,[19]  neither the report nor the fact the incidents alleged were under investigation was included in defendants' submissions in this case.   Further, defendants have failed to address Lee's claim that he was placed in a strip cell for some forty days.   Thus, the court finds there are genuine issues of fact in dispute rendering summary judgment inappropriate as to Lee's excessive force claims arising from the October 8, 2011, incident.

## CONCLUSION

For these reasons, defendants' motion for summary judgment (ECF No. 22) will be granted in part and denied in part with leave to refile within sixty days.   Summary judgment will be granted as to defendants Stouffer, Morgan, Wetzel, Kellar and Covington. Summary judgment will be denied with leave to refile within sixty days as to defendant Lushbaugh.   Counsel shall file a copy of all videotapes of the October 8, 2011 incident in the infirmary and isolation cell if a dispositive pleading is refiled.   Defendants shall also file a copy of the Internal Investigation Unit report of the October 8, 2011, incident.   Additionally, counsel for defendants shall provide within twenty-eight days the names of the officers who escorted Lee to the isolation cell on October 8, 2011, and a work address for W. Bowers.   If a work address is not available for Bowers, counsel

---

[19] Jon P. Galley, Executive Director of the North Region for the Department of Public Safety and Correctional Services, in a letter dated October 23, 2012,  to United States Congressman Elijah E. Cummings stated Lee's allegations of improper medical care and brutality by correctional officers was sent to the Internal Investigative Unit for investigation. ECF No.24, Plaintiff's Opposition, Attachment at 4.   Neither party has filed the results of that investigation.

shall provide his home address **under seal** within twenty-eight days so that additional attempts can be made to effectuate service on him.[20] Further, the dispositive pleading shall address Lee's claims he was injected on October 8, 2011, and he was placed in a strip cell in November of 2011 for forty days.  A separate order follows.


July 19, 2013                                                    _____/s/_____
Date                                                            Catherine C. Blake
                                                               United States District Judge

---

[20]  The court will also direct effectuating service on Windy Watts through the prison medical contractor.